# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KESHA S. PACKER,

                    Plaintiff,

v.

WISCONSIN DEPARTMENT OF
CORRECTIONS,

                    Defendant.

Case No. 18-CV-2024-JPS

**ORDER**

## 1.      INTRODUCTION

Kesha S. Packer, ("Plaintiff"), claims that the Wisconsin Department of Corrections ("Defendant") subjected her to a hostile work environment because of her race and would have responded to her complaints swiftly and effectively if she had been Caucasian. Plaintiff also alleges that the Defendant constructively demoted her. *See generally* (Docket #6 and #32). On December 5, 2019, Defendant filed a motion for summary judgment, contending that Plaintiff cannot establish a prima facie case for either her hostile work environment or constructive demotion claims because Plaintiff cannot show that Defendant discriminated against her based on her race. *See generally* (Docket #23). Plaintiff responded on January 18, 2020, (Docket #32), and Defendant replied on January 31, 2020, (Docket #37). For the reasons explained below, Defendant's motion must be granted.

## 2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3.     RELEVANT FACTS

The following factual overview presents the parties' evidence in a light most favorable to the plaintiff.

### 3.1     Defendant's Complaint Process

The crux of Plaintiff's complaint against Defendant involves Defendant's treatment of Plaintiff's allegations of workplace harassment. Therefore, it is beneficial to outline Defendant's relevant policies and procedures. During the relevant time period, both Wisconsin Department of Corrections ("DOC") Executive Directive #5 ("ED #5") and DOC Division of Community Corrections ("DCC") Administrative Directive #15-19 ("AD #15-19) were in effect. ED #5 was established to:

> (1) prohibit discrimination and harassment, including but not limited to harassment based on a protected status, toward employees, the public, inmates, juveniles or offenders; (2) provide a definition of discrimination and harassment based upon protected status; (3) define staff and supervisory responsibilities; and (4) establish procedures to follow when an employee believes discrimination or harassment has occurred.

(Docket #25-3 at 2).

The DOC expressed its commitment "to maintaining a work environment that is free from discrimination, harassment, bullying and hazing, and ensur[ing] equality of opportunity for all employees." *Id.* at 4. ED #5 made clear that the DOC "will not tolerate or condone discrimination, harassment, bullying or hazing in any form." *Id.* ED #5 instructed current employees who felt they had been subjected to harassment, discrimination, bullying, hazing, or retaliation to tell their supervisor or any supervisor with whom they were comfortable. *Id.* at 7. Employees could submit complaints either verbally or in writing via Form DOC-1282, the employee complaint form. *Id.* Both ED #5 and AD #15-19 also directed how the DCC was to handle employee complaints.

AD #15-19 encouraged employees to confront the other party before filing a complaint. (Docket #25-5 at 1). However, employees could go to a supervisor first if they did not or could not confront the other party. *Id.* The Regional Chief/Office Director reviewed the complaint and then assigned a supervisor to meet with an employee to conduct an intake interview. *Id.* at 2. AD #15-19 defined "intake interview" as "[a] meeting with an employee following the receipt of a verbal or written complaint. . . .[T]o collect information relevant to the complaint and provide resource information to the employee." *Id.* at 1. The interviewer was to complete an intake packet that contained a description of the alleged incident(s), witness information, and copies of supporting documentation. *Id.* at 2. Post-interview, the interviewer "must forward the completed intake packet with all attachments to the Regional Chief/Office Director for their review and decision." *Id.* "The Regional Chief/Office Director will then decide what, if any, follow up is necessary in consultation with DCC Human Resources and the Office of Diversity and Employee Services, as needed." *Id.* The

Regional Director/Office Director was obligated to inform the employee, in writing, of the outcome of the matter "[w]ithin a reasonable time after the intake interview." *Id.*

If warranted, a Division Administrator could take corrective action to address the conduct at issue. (Docket #25-3 at 9). "Corrective action . . . may include: job instruction, training, performance improvement, conflict resolution, mediation and disciplinary action up to and including termination." *Id.* Before taking any disciplinary action, the employing unit "shall ensure" that employees who were accused of work rule violations received due process. *Id.* Lastly, ED #5 noted that all employees were responsible for "[r]espond[ing] to all allegations promptly and appropriately." *Id.* at 5.

### 3.2    Plaintiff's Complaint

Plaintiff was a probation and parole agent in DCC unit 316 from January 2016 until July 28, 2017. (Docket #28-1, #28-2 at 4–5, 7). Plaintiff is African American. (Docket #35 at 1).

On May 31, 2017, Plaintiff submitted a DOC-1282 form to her supervisor. (Docket #28-2 at 20; #35). In her complaint, Plaintiff alleged that June Harper-Cheeks ("Harper-Cheeks"), an Office Operations Associate ("OOA"), had been bullying Plaintiff in the workplace. (Docket #27-1 at 1). The bullying began on March 16, 2017, after Plaintiff e-mailed both Omar Latif ("Latif"), a Program Support Supervisor, and Harper-Cheeks with an innocuous question about DCC's offender discharge procedures. *Id.* at 4.

Thereafter, Harper-Cheeks engaged in behaviors such as "deliberately extend[ing] her arms and widen[ing] her stance when passing by [Plaintiff]" so that Plaintiff had to "back[] against the wall" to avoid being hit by Harper-Cheeks. *Id.* at 1. Harper-Cheeks also allegedly glared

and frowned at Plaintiff in the workplace. *Id.* at 1–2. Plaintiff also described an incident on May 11, 2017, when she asked Harper-Cheeks to see if an offender had reported to the office to meet with Plaintiff. Plaintiff alleged that Harper-Cheeks "raise[d] her voice in a loud[,] unprofessional tone immediately." *Id.* at 2. Plaintiff then went to Latif to report this incident and request intake paperwork so that Plaintiff could file her intake. *Id.* Latif sent this information to Plaintiff and copied her supervisor. *Id.*

On May 24, 2017, Plaintiff was walking back to her desk when Harper-Cheeks "extended her arms outside the width of [Harper-Cheeks'] body frame" so that Plaintiff had to turn sideways so that Harper-Cheeks would not hit Plaintiff. *Id.* Later that day, Harper-Cheeks e-mailed Plaintiff that an offender had checked in. *Id.* Plaintiff had asked Harper-Cheeks (via e-mail) to relay information to the offender. *Id.* Harper-Cheeks replied to Plaintiff that she could not relay messages to the offender on Plaintiff's behalf. *Id.* Plaintiff thanked Harper-Cheeks and then forwarded this correspondence to Latif. The next day, Latif replied that it was "not a problem" for Harper-Cheeks to relay messages to offenders. *Id.*

Harper-Cheeks sent an e-mail to Latif regarding DCC procedures and copied Plaintiff. *Id.* Plaintiff described this e-mail as "contain[ing] unprofessional language, false information, and demeaning/belittling language . . . ." *Id.* Plaintiff also alleged that Harper-Cheeks' presence was "interfering" with her ability "to meet operational needs because [she was] restricted from going to the mailbox several times a day" because the mailroom was next to the reception area, where Harper-Cheeks was stationed. *Id.* On May 25, 2017, Plaintiff avoided going to get the mail until after 4:30 p.m. because she did not want to encounter Harper-Cheeks. *Id.*

Plaintiff believed that Harper-Cheeks was bullying and intimidating her because Plaintiff was younger than Harper-Cheeks. *Id.* Plaintiff, who is a Muslim, also believed Harper-Cheeks stereotyped Plaintiff and assumed that Plaintiff would be passive based on her religion. *Id.* On her complaint form, Plaintiff checked the box that she believed she was being harassed against based on her religion and age, not her race. *Id.* at 1; (Docket 27-2 at 3).

After Plaintiff filed her complaint, Dionna Clemmons ("Clemmons"), Latif, and another field supervisor, Beverly Dillon ("Dillon"), approached Plaintiff and asked if she would be willing to meet with Harper-Cheeks. *Id.* Plaintiff asked if Capitol Police could be at the meeting because she was afraid of what Harper-Cheeks would do to her. *Id.* The supervisors informed Plaintiff that Dillon would be at the meeting. Plaintiff, however, felt uncomfortable without the Capitol Police present. *Id.*; (Docket #34 at 15). The supervisors then told Plaintiff that Harper-Cheeks may approach Plaintiff to try and talk with her and Plaintiff asked the supervisors to tell Harper-Cheeks not to do this. (Docket #27-2 at 3). Thereafter, Harper-Cheeks did not attempt to communicate with Plaintiff. *Id.*

Regional Chief Neil Thorenson ("Thorenson") assigned Corrections Field Supervisor Amy Romenesko ("Romenesko") to conduct Plaintiff's intake interview. (Docket #25 at 3). On June 6, 2017, Romenesko interviewed Plaintiff offsite as opposed to at the State Office Building, as that was Plaintiff's preference. (Docket #27 at 2–3). Romenesko documented all of the information she gathered during the approximately two-hour interview in an "intake summary memorandum." *Id.* at 3. Romenesko asked whether Plaintiff was interested in mediation with Harper-Cheeks. *Id.* Initially,

Plaintiff said she was open to this "if there were enough people present to restrain [Harper-Cheeks] if needed and if [Plaintiff] could sit close to a door." (Docket #27-2 at 3). However, Plaintiff sent Romenesko an e-mail two days later stating that she had changed her mind about meeting with Harper-Cheeks even if supervisors were present. *Id.* Plaintiff attributed this to hearing "the OOA staff . . . arguing with each other loudly." (Docket #27-1 at 12). Plaintiff said that she was "no longer [] willing to voluntarily compromise [her] safety or subject [herself] to this type of behavior." *Id.* She said that she did not see another resolution other than either Plaintiff or Harper-Cheeks being removed from the State Office Building. *Id.*

Romenesko did not believe that Plaintiff's situation warranted involving law enforcement. (Docket #27 at 3). Romenesko sent the intake summary, Plaintiff's complaint, and exhibits to Thorenson on June 20, 2017. *Id.* Although Thorenson did not believe that Plaintiff's interactions with Harper-Cheeks rose to the level of a hostile work environment based on a protected class, he thought a personnel investigation of Harper-Cheeks may be warranted. *(*Docket #25 at 3). On June 23, 2017, he forwarded the intake information and exhibits to Katrina Kleven ("Kleven") and Kathryn Tabbutt ("Tabbutt") in Human Resources, who then forwarded the e-mail on to the Office of Diversity and Employee Services ("ODES"). *Id.* Thorenson requested their feedback and recommendations about what to do with regard to Harper-Cheeks. *Id.*

On July 13, 2017, Thorenson received an e-mail from Deborah Southworth ("Southworth") and Tracey Lomax ("Lomax") at ODES. *Id.* at 4. Although ODES agreed that "there did not appear to be a link between Harper-Cheeks['] [sic] alleged behavior and any protected status of Packer," ODES found Harper-Cheeks' behavior to be concerning and

supported a personnel investigation. *Id.* at 4. That same day, Thorenson told Kleven that he would probably "assign the same 2 investigators" that were already conducting a different, separate personnel investigation on Harper-Cheeks. (Docket #26-1 at 1). However, the personnel investigation technically began on July 24, 2017 after Latif completed a DOC form 1271A, "Employee Investigation Report, Notice of Potential Rule Violation." (Docket #25 at 4). Thorenson received this form from Latif on Friday, July 21, and subsequently opened the formal investigation, Investigation No. 500-17-125, the following Monday. *Id.*

Because Packer was afraid of escalating incidents with Harper-Cheeks, Plaintiff asked her supervisor, Clemmons, to sign her out at the end of the day to avoid being near Harper-Cheeks by herself. (Docket #35 at 4). If Clemmons was available, she would sign Plaintiff out. (Docket #36-1 at 12). According to Plaintiff, this was another example of how working with Harper-Cheeks hindered Plaintiff from carrying out her duties. *Id.*

Plaintiff gave her two weeks' notice on Friday, July 14, 2017 and her last day was Friday, July 28. (Docket #28-1). She began working at the Milwaukee Secure Detention Facility on August 7, 2017, although "it was a demotion and involved reduction in pay." (Docket #28-2 at 3, Docket #35 at 4).

### 3.3    Investigation No. 500-17-125

Plaintiff's investigation was joined with that of another DCC employee who had had an incident with Harper-Cheeks. Thus, Investigation No. 500-17-125 investigated both Plaintiff's and DCC employee Gladys Singleton's ("Singleton") respective complaints against Harper-Cheeks. (Docket #38 at 23). Singleton is African American. (Docket #36-1 at 5). Singleton alleged that on June 20, 2017, Harper-Cheeks "ran her

whole body into [Singleton's right side] with such a great force" that Harper-Cheeks knocked Singleton on the counter and "rammed one of her knees right into" the back of one of Singleton's thighs. (Docket #25-1 at 1). According to Singleton, Harper-Cheeks began laughing loudly and walked back to her cubicle. *Id.*

Thorenson assigned Sheryl A. Dean ("Dean") and Rebekah Cieslak ("Cieslak") to investigate. *Id.* at 2. Dean and Cieslak interviewed Plaintiff on July 28, Singleton on August 1, two employees regarding Singleton's complaint on August 21, and one employee regarding Plaintiff's complaint on August 22. *Id.* at 3–12. Dean and Cieslak spoke to Harper-Cheeks on both August 28 and September 8, 2017. *Id.* at 3. The investigators submitted a final investigation packet to Thorenson on September 28, 2017. *Id.* at 3. After reviewing their report, Thorenson "did not believe that there was sufficient evidence to support disciplinary measures against Harper-Cheeks" and that the matter "appeared [to him] to be a she-said/she-said situation." (Docket #25 at 5). With regard to this investigation, Harper-Cheeks was notified that DCC would not be taking any disciplinary action on October 18, 2017. (Docket #25-1 at 23).

### 3.4 Other DCC Complaints

Plaintiff offers evidence of how the DCC handled other complaints both prior to and during the relevant time period.

#### 3.4.1 Jodi Alwin

Jodi Alwin ("Alwin"), a DCC employee, submitted an internal investigation complaint on May 27, 2015. (Docket #36-2 at 5). Alwin is Caucasian. (Docket #36-1 at 2). In her complaint, Alwin alleged that a colleague, Shayla Fenceroy ("Fenceroy"), threatened her. (Docket #36-2 at 5). The incident that led to the complaint took place in front of another

employee, Kim Betzhold's ("Betzhold"), office. *Id.* That same day, another employee, Kristen Lentz ("Lentz"), interviewed Alwin and completed an intake checklist. *Id.* at 1. Alwin also completed an official complaint form. *Id.* at 4. Betzhold met with Fenceroy and offered her the opportunity to fill out an intake as well. *Id.* at 6. Betzhold told Fenceroy that although the ED #5 concerns "harassment based on protected class", which may not apply to Fenceroy's situation, the process "would be a vehicle for [Fenceroy] to speak with someone about the incident and the information would be forwarded to [Thorenson] for review" *Id.* According to Betzhold, Fenceroy did not think that was necessary. *Id.*

After receiving the intake information from Lentz, Thorenson reached out to Kleven in Human Resources. He stated:

> [f]or me, there is not a lot here. I am not even sure a job instruction is warranted. I am thinking more of an informal job counsel or a discussion with [Fenceroy] about professionalism followed by an e-mail summary not in official job instruction format. What do you think?

*Id.* at 7–8.

This e-mail was forwarded from Kleven to Lomax over at ODES on June 2, 2015. *Id.* at 7. Lomax replied a couple of hours later stating that she agreed with Thorenson but also that "DCC might want to consider a disciplinary investigatory [sic]." *Id.* Thorenson sent Alwin a letter later that day notifying her "that there was not sufficient evidence to support a finding of harassment . . . on a protected status. Notwithstanding, some of the information shared will result in steps being taken in an effort to address those concerns." *Id.* at 9. The investigation was closed on June 2, 2015.

### 3.4.2    Ghia Davis

On September 10, 2015, Field Supervisor Patricia Breyer-Robinson ("Breyer-Robinson") e-mailed Thorenson informing him of a "dust up" between Harper-Cheeks and another OOA, Ghia Davis ("Davis"). (Docket #36-4 at 1). Davis is African American. (Docket #36-1 at 2). Prior to this "dust up," both Davis and Harper-Cheeks had approached other supervisors to report "tension/issues/etc [sic] with each other" and that this behavior was "noticeable in the work setting." (Docket #36-4 at 1). Breyer-Robinson, Dillon, and another DCC employee, Nora Diderrich ("Diderrich") "discussed options and determined that handling it informally at the local level was the best step." *Id.*  Davis, Harper-Cheeks, Dillon, Dillon's husband (a "behavioral consultant, author, life coach, and motivational speaker"), Diderrich, and Breyer-Robinson met for one hour on September 10. *Id.* During the meeting, Davis and Harper-Cheeks agreed to meet one-on-one to "squarely address what issues or misperceptions may exist between them and smooth out the rift." *Id.* Both Davis and Harper-Cheeks were to then inform either Diderrich or Breyer-Robinson that they met. *Id.* Breyer-Robinson also told Thorenson that the managers were going to meet with the OOA staff to "reiterate the Department's policy of zero tolerance on bullying, harassment, hazing, and the negativity that is generated by gossip, unprofessionalism, disrespect or lack of courtesy." *Id.*

### 3.4.3    Patricia Breyer-Robinson

Breyer-Robinson is Caucasian and Dillon is African American. (Docket #36-1 at 2). Breyer-Robinson alleged that on February 13, 2017, Dillon was upset about an e-mail that Breyer-Robinson sent and accused Breyer-Robinson of going "too far." (Docket #36-3 at 4). Dillon then pushed Breyer-Robinson into a desk as she left the area. *Id.* Later that day, during a

conference call, Breyer-Robinson and Dillon exchanged words. *Id.* at 5. Breyer-Robinson said she felt bullied, intimated, humiliated and disrespected by Dillon, who "berated" Breyer-Robinson in front of their colleagues. *Id.* at 5. On February 17, 2017, a DCC employee notified Breyer-Robinson that Sara Hugo would be conducting Breyer-Robinson's intake interview. *Id.* at 15. Breyer-Robinson's formal intake interview was on March 1, 2017. *Id.* at 1. Breyer-Robinson also filled out her formal complaint that day. Two days later, Kleven forwarded this information to ODES. *Id.* at 49. In her e-mail, Kleven noted that Thorenson and the Assistant Regional Chief met with Dillon on February 23, 2017 and "provided her with some verbal instructions related to her behaviors on February 13, 2017." *Id.* In her e-mail, Kleven indicated that the DCC Human Resources office would like to recommend that Breyer-Robinson and Dillon engage in mediation. *Id.* There is no information as to the final resolution of this matter.

### 3.4.4   Barbette Carr & Gladys Singleton

Like Singleton, Barbette Carr is also African American. (Docket #36-1 at 2). According to Latif's report, Carr and Singleton were talking in a conference room when Harper-Cheeks entered and, while using a loud tone and foul language, accused Carr and Singleton of talking about her. (Docket #36-5 at 1).  Singleton gave a written statement but Carr refused to do so. *Id.* Both Latif and Dillon were of the opinion that Harper-Cheeks intimidated Carr, although Carr denied this. *Id.* After speaking with Carr and Singleton, Latif completed his report on a DOC 1271A "Notice of Potential Work Rule Violation" form on June 2, 2017.  Thorenson reviewed the report on June 3, 2017 and assigned Dean and Rebekah Cieslak to investigate into this matter. *Id.* at 2. This investigation was numbered "500-17-88".

Between June 13 and June 30, 2017, Dean and Cieslak conducted five interviews regarding Investigation 500-17-88. *Id.* at 3. They submitted their initial report to Thorenson on July 7. *Id.* However, the last log entry on the "Employee Investigation Report" reads, "09/08/17: Predisc results sent to RC Thorenson." *Id.* On October 2, 2017, Latif issued a memorandum to Harper-Cheeks titled "Professional Communications in the Workplace". *Id.* at 20. The memorandum explained that DCC expected Harper-Cheeks to adhere to certain standards and required her to complete four online trainings on effective communications by November 1, 2017. *Id.*

### 3.4.5   Theresa Peet

On December 26, 2018, Supervisor Amy Rodriguez ("Rodriguez") filled out a Notice of Potential Work Rule Violation form DOC-1271A regarding Harper-Cheeks and Theresa Peet ("Peet"). (Docket #36-7 at 1–2). Peet is African American. (Docket #36-1 at 4). Rodriguez' report describes a physical altercation between Peet and Harper-Cheeks that occurred on December 21, 2018. Thorenson reviewed this report on January 2, 2019. (Docket #36-7 at 3). Harper-Cheeks was temporarily reassigned to a different DCC location on December 27, 2018. *Id.* at 3, 40. Both Harper Cheeks and Peet were terminated as a result of this incident on March 19, 2019. *See id.* at 91–92; (Docket #36-1 at 11).

### 4.   ANALYSIS

#### 4.1   Hostile Work Environment

##### 4.1.1   The Appropriate Test

Plaintiff believes that if she had been white, Defendant would have dealt with her complaint against Harper-Cheeks "swiftly and effectively." (Docket #32 at 5). Plaintiff also claims that Defendant's alleged failure to

address her complaint is racially motivated and, as a result, Plaintiff was the victim of a hostile work environment. *Id.*

To state a claim for discrimination based on a hostile work environment, Plaintiff must show that:

> (1) she was subjected to unwelcome harassment; (2) the harassment was based on a protected status; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.

*Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Defendant argues that Plaintiff fails to establish a prima facie case for discriminatory hostile work environment because Plaintiff does not meet prongs two through four, above. According to Defendant, Plaintiff does not satisfy prong two because Plaintiff cannot show that Harper-Cheeks' harassment was based on Plaintiff's race. Notably, Plaintiff could (but does not) argue that she endured harassment by Harper-Cheeks based on her religion or age. However, Plaintiff states that (1) she does not contend that Harper-Cheeks' conduct was racially motivated *and* (2) she is unconcerned with Harper-Cheeks' motivations for her conduct.

Plaintiff argues that she satisfies the second prong of the test via the motives of her supervisors. As mentioned above, Plaintiff "believes that her complaint about Harper-Cheeks' antisocial, hostile, and physically intimidating harassment of her would have been dealt with swiftly and effectively by her superiors if she had been white." (Docket #32 at 5). Through this allegation, Plaintiff appears to be asking the Court to evaluate whether Defendant treated Plaintiff differently based on her race, which is really an allegation of "disparate treatment" under Title VII. To determine

Case 2:18-cv-02024-JPS   Filed 06/16/20   Page 14 of 23   Document 40

disparate treatment, the Court must analyze "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Plaintiff inserts this disparate treatment test within the overarching Title VII hostile work environment analysis.

Plaintiff then asks the Court to consider Harper-Cheeks' conduct when evaluating prong three. (*See* Docket #32 at 7–11). According to Plaintiff, "Harper-Cheeks' verbal outbursts stay in the mix because the question is only whether her mistreatment of Packer was sufficiently severe or pervasive that a racially-motivated failure to address it is actionable under anti-discrimination laws like Title VII." *Id.* at 11.

Lastly, when evaluating prong four, employer liability, a plaintiff must show that his or her employer has been negligent either in discovering or remedying the harassment. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2016). Here, however, Plaintiff proffers evidence of how Thorenson, the DCC Regional Chief, evaluated the complaints of both African American and Caucasian employees under his jurisdiction. According to Plaintiff, "[w]hen white employees under his jurisdiction complained of threatening or antisocial behavior on the part of their co-workers, steps were taken to protect them almost immediately. When black employees under his jurisdiction complained of threatening or antisocial behavior on the part of their coworkers, they were left to their own devices for weeks." (Docket #32 at 13). Again, it appears to the Court that Plaintiff is making a disparate treatment argument and is inserting it into prong four of the hostile work environment test to try and establish Defendant's liability.

In summation, Plaintiff offers the following in support of her hostile work environment claim: (1) Harper-Cheeks' harassment of Plaintiff; (2) the motives of DCC supervisors to establish that the discrimination was based on a protected status, because Plaintiff is "unconcerned" with Harper-Cheeks' motives at this prong; (3) Harper-Cheeks' actions to show severity and pervasiveness; and (4) a comparison of how Plaintiff's supervisors treated the complaints of African American employees and Caucasian employees to show employer liability. Again, Plaintiff conflates two theories of Title VII liability. The Court will not entertain this muddled legal theory. Fortunately, the Court can dismiss Plaintiff's claim of hostile work environment (focused on Defendant's motives) and Plaintiff's inadvertent disparate treatment claim.

### 4.1.2   Plaintiff's Hostile Work Environment Claim

If Plaintiff is alleging that she suffered a hostile work environment based on Defendant's actions or inactions—not Harper-Cheeks' conduct—then so be it.  As mentioned above, Plaintiff has to show that (1) Defendant harassed Plaintiff; (2) based on Plaintiff's protected status; (3) Defendant's conduct was severe and pervasive; and (4) there is a basis for employer liability.

Even construing the facts in Plaintiff's favor, as the Court must do at this stage, Plaintiff cannot establish that Defendant subjected Plaintiff to harassment based on her protected status. At prong two, Plaintiff offers evidence in furtherance of her claim that Defendant would have dealt with Plaintiff's complaints more expeditiously if Plaintiff was Caucasian.

Because this is essentially a "disparate treatment" claim, the Court will analyze the evidence accordingly.[1]

In furtherance of the *Ortiz* standard, the Court can use the framework outlined in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), to "cull[] the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action" based on Plaintiff's race. *Johnson*, 892 F.3d at 894. Under *McDonnell Douglas,* the Court evaluates Plaintiff's claim by looking to see if (1) Plaintiff is a member of a protected class; (2) she met Defendant's legitimate expectations; (3) whether Defendant subjected her to unfavorable treatment despite meeting those expectations; and (4) whether similarly situated non-African American employees were treated more favorably than Plaintiff. *Hamilton v. Delta Air Lines, Inc.*, Case No. 17-CV-1725-JPS, 2018 WL 3553380 at *4 (E.D. Wis., July 24, 2018) (citing *Johnson*, 892 F.3d at 895). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff has met his burden on this issue." *Johnson*, 892 F.3d at 895.

---

[1]Plaintiff refers to *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010) to support her contention that "indifference to harassment" may demonstrate bias on the part of a superior. In *T.E.*, the Court found that a jury could infer that the defendant discriminated against the plaintiff based on her protected status because the defendant "covered up reports of abuse," and attempted to "downplay" complaints. *Id.* at 589. However, Plaintiff's case differs from *T.E.* because Plaintiff does not allege that Defendant, without more, downplayed, covered up, or failed to respond to Plaintiff's complaint. Instead, Plaintiff alleges that her complaint was dealt with, but that the pace at which Defendant looked into her allegations would have been faster had she been white. This is the very essence of a disparate treatment claim.

Plaintiff does not proffer evidence of similarly situated non-African American employees, and, therefore, has not met her burden. To support her argument, Plaintiff offers the complaint processes of two Caucasian DCC employees, Jodi Alwin and Patricia Breyer-Robinson.[2] However, Alwin and Breyer-Robinson are not similarly situated to Plaintiff. The DCC was able to handle Alwin's and Breyer-Robinson's complaints on a shorter timeline because their complaints were very different from Plaintiff's complaint—indeed, neither of them resulted in a personnel investigation.

The Court recognizes that unlike Alwin and Breyer-Robinson, Plaintiff was not interviewed on the exact date that she filed her complaint, May 31, 2017. However, Plaintiff was interviewed within a week, off-site (which she requested) on June 6. In the interim, she was approached by supervisors who suggested that she and Harper-Cheeks meet up to discuss their issues, which Plaintiff refused due to her safety concerns. Plaintiff's interviewer suggested mediation on June 6, however, Plaintiff declined that as well. While it did take Romenesko about two weeks after meeting with Plaintiff to get her report to Thorenson, Thorenson reached out to Human Resources three days later and suggested a personal investigation into Harper-Cheeks. Although it did not appear to him that Harper-Cheeks was bullying Plaintiff based on a protected class, it appears that he did find cause for concern. Again, the Court recognizes that it took ODES several

---

[2]Plaintiff also offers into evidence the accounts and timelines of how Defendant handled the complaints of other African American employees. However, this is not a class action lawsuit and Plaintiff does not bring a complaint against Defendant on behalf of these other named employees. Nevertheless, if the Plaintiff was going to compare the manner in which the DCC addressed the complaints of Davis, Carr, Singleton, and Peet to Alwin and Breyer-Robinson, Plaintiff again would be unable to show that these employees are similarly situated with respect to their complaints.

weeks to get back to Thorenson, however, there is no evidence that this timeline would not have applied to similarly situated people who were not African American. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014). ODES ultimately supported Thorenson's recommendation and steps were taken to start Investigation No. 500-17-125.

The main difference between Plaintiff's complaint and both Alwin's and Breyer-Robinson's is the fact that DCC took Plaintiff's complaint one step further and opened a personnel investigation for Harper-Cheeks. Alwin's and Breyer-Robinson's complaints were resolved much more quickly because the nature of their issues did not require a personnel investigation. According to Thorenson, he "wasn't even sure a job instruction was warranted" in Alwin's case; therefore, it is reasonable that this matter was disposed of within a matter of days. With regard to Breyer-Robinson's complaint, Human Resources offered a recommendation that Breyer-Robinson and Dillon engage in mediation. Although the Court is not sure whether this mediation ever took place, there is no evidence before the Court that a personnel investigation was opened up for any potential rule violations by Dillon.

A "similarly situated" Caucasian DCC employee would have been an employee with a complaint that warranted a personnel investigation and, therefore, required interviews and/or other fact-gathering methods and procedures, as well as a review by Thorenson, Human Resources, and ODES. For the Court to find that a potential fact issue exists as to whether Defendant handled the complaints of similarly situated white employees more expeditiously, Plaintiff would have to provide evidence of similarly situated employees whose ED #5 complaints turned into work rule violation investigations. Plaintiff does not meet her burden. Therefore,

Case 2:18-cv-02024-JPS   Filed 06/16/20   Page 19 of 23   Document 40

there is no genuine factual issue before the Court as to whether the Defendant discriminated against Plaintiff based on her race because of how it handled her complaint.

Plaintiff also argues that Defendant deviated from standard procedures with regard to Plaintiff's complaint and that this "deviation" is circumstantial evidence of discrimination. However, the facts show that Defendant followed the ED #5 intake procedure and then went an additional step further to open a personnel investigation into Harper-Cheeks' conduct. Plaintiff alleges that the substantial deviation of DCC procedure, as compared to Alwin and Breyer-Robinson, was that no supervisors took immediate action against Harper-Cheeks after Plaintiff filed her complaint. However, Alwin's and Breyer-Robinson's cases are, again, inapposite.

First, with regard to Alwin's complaint, the Alwin-Fenceroy incident took place in front of another DCC employee. Second, Betzhold, who met with Fenceroy on the day of the incident, did not meet with Fenceroy to reprimand her but to offer her the opportunity to fill out an intake complaint against Alwin. In the case of Breyer-Robinson and Dillon, Plaintiff shows that Thorenson and the Assistant Regional Chief provided Dillon with instructions prior to Breyer-Robinson filing her complaint. However, Plaintiff received similar assistance from her supervisors during her issue with Harper-Cheeks. For example, when Plaintiff initially told Latif that Harper-Cheeks was being uncooperative and would not relay messages to offenders, Latif reached out to Harper-Cheeks and reminded her to maintain professional communications in the workplace. After Plaintiff filed her complaint, on May 31, 2017, Plaintiff's supervisors told her that Harper-Cheeks would try to talk to her. After Plaintiff asked her

supervisors to tell Harper-Cheeks not to do this, Harper-Cheeks did not attempt to talk to Plaintiff. Further, if available, Clemmons would sign Plaintiff out at the end of the day so she would not have to encounter Harper-Cheeks.

Based on the facts above, it does not appear that Defendant deviated from any "procedure" with regard to Plaintiff's complaint. Instead, the record shows that Defendant took unique and tailored measures in each complaint scenario, irrespective of the complainant's race.

### 4.2 Plaintiff's Constructive Demotion Claim

Plaintiff also claims that Defendant constructively demoted her. Plaintiff argues that "a jury could find that a reasonable person in Plaintiff's shoes would have sought to get out of that workplace even if it meant taking a pay cut." (Docket #32 at 25). The applicable test, however, is not whether a reasonable person would have sought to get out of his or her workplace. "[A] constructive demotion analysis should have the same structure as that for constructive discharge." *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). Plaintiff must first "show that [her] working conditions were so intolerable that a reasonable person would have been compelled to resign." *Id.* at 877 (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)). Plaintiff must also show that these conditions were "intolerable because of unlawful discrimination." *Id.* (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)).

Both Plaintiff and Defendant argue over whether Harper-Cheeks' conduct made Plaintiff's workplace intolerable. However, Plaintiff has made it clear that Harper-Cheeks' conduct is not at issue, but alleges that Defendant was engaged in racially based discrimination. Therefore, the Court must analyze whether Defendant's conduct was so intolerable

towards Plaintiff that she was forced to resign, and that Plaintiff's working conditions were intolerable because of Defendant's unlawful discrimination against Plaintiff.

Plaintiff cannot show that Defendant's treatment of her claim was so intolerable that she was forced to quit and then accept a different position. Plaintiff's only evidence is that her complaint took from May 31, 2017 through October 8, 2017 to resolve. However, Plaintiff offers no other comparators to help the Court determine that this process was unreasonable and, therefore, intolerable. As mentioned above, she does not adduce sufficient evidence that her complaint was handled differently as a result her race. Plaintiff does not offer evidence of similarly situated, non-African American employees who had discrimination complaints-turned-personnel investigations take a significantly less amount of time. The only other evidence of a personnel investigation Plaintiff offers is based on the allegations of another African American woman and this investigation resulted in discipline for Harper-Cheeks. Therefore, Plaintiff cannot satisfy this constructive demotion test because she cannot show that her work conditions were intolerable or that Defendant handled her complaint slower than it would have had Plaintiff been white.

5.    **CONCLUSION**

It is unfortunate that Plaintiff had to deal with Harper-Cheeks' behavior. It is also unfortunate that after finding that Harper-Cheeks' conduct was not motivated by Plaintiff's protected status, it took Defendant about three months to investigate Harper-Cheeks' potential work rule violations. However, Plaintiff has not offered evidence suggesting that in handling Plaintiff's complaints against Harper-Cheeks, Defendant subjected Plaintiff to disparate treatment and discriminated against her

based on her race. Therefore, Plaintiff cannot show that Defendant subjected her to a hostile work environment based on Defendant's allegedly racially motivated conduct. Lastly, Plaintiff cannot make out a prima facie case of constructive demotion. Therefore, the Court must grant Defendant's motion for summary judgement and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #23) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 16th day of June, 2020.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge